UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-60772-CIV-MARRA
[lead action: consolidated with Case No. 11-CIV-60780]

L.J., by his mother and next friend, N.N.J.,
and N.N.J.,
    plaintiffs,
vs.
SCHOOL BOARD OF BROWARD COUNTY,
    defendant.
_____/   Case No. 11-60772

THE SCHOOL BOARD OF BROWARD COUNTY,
FLORIDA,
    plaintiff,
vs.
L.J., a minor child, by and through his parent, N.N.J., as parent,
    defendant.
_____/   Case No. 11-60780

**MEMORANDUM OPINION ESTABLISHING STANDARD OF REVIEW
AND DIRECTING SUBMISSION OF SUPPLEMENTAL BRIEFS**

**I. Preface**

**THIS MATTER** involves a dispute under the Individuals with Disabilities Education Act ("IDEA"), 20 U. S. C. § 1400, *et seq*. Pursuant to the procedures established by the IDEA, 20 U.S.C. § 1415(i)(2)(A), the School Board of Broward County ("School Board") seeks judicial review of an administrative law judge's determination that the School Board deprived L.J., a disabled middle school student, of the free and appropriate public education guaranteed under the IDEA by failing to adequately implement the child's individualized education program [Case No. 11-60780-CIV-MARRA]. The child's mother, N.N.J., has filed a separate complaint seeking, among other things, enforcement of the administrative law judge's ("ALJ") order [Case No. 11-60772-CIV-MARRA].

Following consolidation of these matters, the case is currently before the court on the parties' cross-motions for entry of judgment on the administrative record [DE ## 29, 30].

## II. Statutory Framework

The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to a free appropriate public education ("FAPE") that "emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." *Ortega v Bibb County School District*, 397 F.3d 1321 (11th Cir. 2005), citing 20 U. S. C. §1400(d)(1)(A);[1] *J. W. ex rel. J. E. W. v. Fresno Unified School District*, 626 F.3d 431, 432 (9th Cir. 2010).

Pursuant to the IDEA and corresponding Florida laws, in order to achieve an "appropriate" education, the school district and parents work together to develop an individualized education program ("IEP") for each child with a disability. *Doe v. Ala. State Dept. Of Education,* 915 F.2d 651, 661 (11th Cir. 1990); *Weber v Cranston School Committee*, 212 F.3d 41, 51 (1st Cir. 2000); 20 U. S.C. § 1414(d); 34 C. F. R. §300.45 (outlining parental involvement in the IEP process). The IEP is a written statement setting out the student's "individually tailored goals and the means of achieving them," and is a "central component" of a disabled student's special education under the

---

[1] The IDEA further defines a FAPE as:

special education and related services that - (A) have been provided at public expense, under public supervision and direction and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate . . . secondary school education in the state involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. §1414(d)].

20 U.S.C. §1401(9).

2

IDEA. *District of Columbia v. Doe,* 611 F.3d 888, 892 n.5 (D.C. Cir. 2010), citing 20 U.S.C. §1414(d). Parents serve as members of the team that develops the IEP, and parental "concerns" for "enhancing the education" of the child must be considered by the team.[2]

Once an IEP is developed, the school must determine whether it will directly provide the special education needs of the child. *M.M. v. School Board of Miami-Dade County, Florida*, 437 F.3d 1085 (11th Cir. 2006), citing *Loren F. ex rel. Fisher v. Atlanta Independent School System,* 349 F.3d 1309, 1312 (11th Cir. 2003) ("Although the IDEA reflects a structural preference in favor of providing special education in public schools, it recognizes that certain public schools are unable or unwilling to provide appropriate special education services"). If the school elects not to provide the programs outlined in the IEP, it refers the child to a private school or program at no cost to the parent. *Id.,* citing 20 U.S.C. §1412(a)(10)(B)(i); 34 C. F. R. §300.401.

If, instead, the school elects to provide the services outlined in the IEP, the parents have three options: First, the parents may enroll their child in public school and receive the services outlined

---

[2] The IEP is crafted and revised by a team consisting of the child's parents, the child's regular classroom teacher, a special education teacher, a representative of the local educational agency and other individuals with knowledge and expertise regarding the child. 20 U.S.C. § 1414(d)(1)(B). The IEP must include a statement of the child's present level of academic and functional performance, measurable annual goals, special education and supplemental services, and any program modifications for the child, along with an explanation of the extent to which the child will not participate with non-disabled children in regular classes and activities, a projected date for the beginning of any special supplementary services or modification, and the anticipated frequency, location and duration of such services and modifications. § 1414(d)(1)(A)(i).

In developing the IEP, the team must consider the child's strengths, the concerns of the parents, the results of the most recent evaluation of the child, and the academic, developmental and functional needs of the child, along with other "special factors" particular to children with certain needs. § 1414(d)(3)(A), (B).

The local educational agency must ensure that the IEP is reviewed periodically, no less than annually, "to determine whether the annual goals for the child are being achieved," and to revise the IEP as needed based on the child's progress and anticipated needs." § 1414(d)(4).

in the IEP at no cost. Second, the parents can acknowledge that the IEP is sufficiently adequate to provide a FAPE, but elect to voluntarily enroll their child in a private school or program at their own expense. *Id.*, citing 20 U.S.C. § 1412(a)(10)(C)(i). Third, the parents can notify the school that they are rejecting the IEP and then challenge the substance of the IEP via a due process hearing. *Id.*, citing 20 U.S.C. §§1412(a)(6)(A) and 1415(a)-(o). *See generally Winkelman ex rel. Winkelman v Parma City School District,* 550 U.S. 516 (2007); *Honig v. Doe*, 484 U.S. 305, 311-12 (1988) (IDEA guarantees parents an "opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate"). If the parents then place the child in a private school pending a determination of their claim, and the reviewing hearing officer ultimately finds the substance of the IEP to be lacking, it may require the school to reimburse the parents for the cost of the private enrollment. 20 U.S.C. § 1412(a)(10)(C)(ii); 34 CFR §300.043(c).[3]

A public school system has "essentially the same right if, for example, it seeks to test the validity of a proposed IEP, or to challenge an existing IEP as over-accommodating." *Lesser v Wilton-Lyndeborough Coop. School District,* 592 F.3d 267, 269 (1st Cir. 2010)(per curiam). The burden of persuasion at the resulting hearing lies with the party seeking relief, whether that is the

---

[3] *See e.g. Diaz-Fonseca v Puerto Rico*, 451 F.3d 13 (1st Cir. 2006); *M.S. ex rel. Simchick v. Fairfax County School Board*, 553 F.3d 315 (4th Cir. 2009)(court can order that private school tuition be reimbursed); *Park ex rel. Park v Anaheim Union High School District,* 464 F.3d 1025 (9th Cir. 2006)(court can order additional training for a child's teacher). *See also Freen C. v. School Dist. of Philadelphia*, 612 F.3d 712 (3d Cir. 2010)(since school district previously failed to provide student a FAPE prior to the student turning twenty-one years old, student could only be fully compensated by award of compensatory education that contained elements of FAPE she was previously denied (annual IEPs)).

disabled child or the school district. *Schaffer ex rel. Schaffer v Weast*, 546 U.S. 49, 62 (2005). Once the IDEA's administrative due process hearing procedures are exhausted, either side may appeal from the hearing officer's final decision to either a federal or state court of competent jurisdiction. 20 U.S.C. § 1415(i)(2)(A).

### A. Content-Based IEP Challenges

A hearing officer confronted with a content-based IEP challenge must conduct a two step inquiry. First, the hearing officer must determine whether the school complied with procedures set forth in the IDEA in developing the IEP (*i.e.*, whether there was proper formation of an IEP team and sufficient involvement of the parents in the IEP formation). After concluding this inquiry, it must then determine whether the challenged IEP is "reasonably calculated to enable the child to receive educational benefit." *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 206-07 (1982) ("*Rowley*").

Under this second, substantive prong of the *Rowley* test, commonly referred to as the "basic floor of opportunity" test, the school system must provide the child "some educational benefit," but need not provide a "potential-maximizing" education. *Rowley*, 458 U.S. at 200; *M.M. ex rel. C.M. v. School Board of Miami-Dade County*, 437 F.3d 1085 (11th Cir. 2006); *Devine v. Indian River County School Board*, 249 F.3d 1289, 1292 (11th Cir. 2011); *JSK by and through JK and PGK v. Hendry County School Board*, 941 F.2d 1563, 1572-73 (11th Cir. 1991). *See also T.R. v. Kingwood Township Bd. of Education,* 205 F.3d 572 (3d Cir. 2000); *Cerra v Pawling Cent. School District*, 427 F.3d 186 (2d Cir. 2005); *Adam J. ex rel. Robert J. v. Keller Ind. School District,* 328 F.3d 804 (5th Cir. 2003); *Amann v Stow School System*, 982 F.2d 644 (1st Cir. 1992).

Put another way, "the IDEA sets modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP." *D.B. a minor, by his next friend and mother, Elizabeth B.,* – F.3d –, 2012 WL 975564 (1st Cir. March 23, 2012), citing *Lenn v Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993).

### B.  Failure- to- Implement IEP Challenges

A different standard of review applies where the parent initially accepts the IEP, but later challenges the sufficiency of the school's implementation of the plan.  Although the Eleventh Circuit has not yet expressly addressed this issue, other circuits addressing failure-to-implement complaints under the IDEA follow the "material failure" approach articulated by the Fifth Circuit in *Houston Indep. School District v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000), *cert. den.*, 531 U. S. 817 (2000) ("*Bobby R"*).  *Bobby R* concludes, in pertinent part:

> A party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP.  This approach affords local agencies some flexibility in implementing IEPs, but it still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

*See also, Sumter County School District 17 v. Heffernan ex rel. TH,* 642 F.3d 478 (4th Cir. 2011*)* (although failure to perfectly execute the IEP does not necessarily amount to denial of FAPE, failure to implement substantial or significant provision of the IEP violates IDEA); *N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dept. of Education*, 600 F.3d 1104 (9th Cir. 2010), citing *Van Duyn ex rel. Van Duyn v. Baker School Dist. 5J,* 502 F.3d 811 (9th Cir. 2007) (material failure to implement the IEP is more than a minor discrepancy between the services a school actually provides and services required under the IEP); *Savoy v District of Columbia,* – F. Supp. 2d –, 2012 WL

6

548173 (D.D.C. Feb. 21, 2012). Under this standard, the focus is on the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld. *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011). An IEP implementation failure, without more, does not constitute a *per se* denial of a FAPE or a *per se* violation of the IDEA. *Burke v. Amherst School District,* 2008 WL 5382270, * 11 (D.N.H. Dec. 18, 2008); *see generally Van Duyn,* 502 F.3d at 821-22; *Bobby R,* 200 F.3d at 344-45.

This is a materially distinct inquiry from the "basic floor of opportunity" *Rowley* threshold used to measure the adequacy of an IEP's content in the first instance. The materiality standard does not require that the child suffer demonstrable educational harm in order to prevail in an implementation failure claim, although the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided. *Burke, supra.* For example, if a child is not provided the reading instruction called for by the IEP and there is a shortfall in the child's reading achievement, that would tend to show the failure to implement the IEP was material. Conversely, if the child performed at or above the anticipated level, that would tend to show that the shortfall in instruction was not material. *Id.* at * 9.

### C. The IDEA "Stay-Put" Requirement

When a parent requests a due process hearing under the IDEA, whether to challenge the content of a proposed IEP or implementation of an agreed-upon IEP, the pendency provision of the IDEA requires the school to maintain the child in the most recently agreed upon educational placement pending completion of administrative review proceedings, unless the parent and the school otherwise agree. 20 U. S. C. §1415(j). This "stay-put" provision of the IDEA seeks to ensure that while a dispute regarding a child's placement is ongoing, the child's existing placement is not

disturbed without permission of the parents. *Honig v Doe*, 484 U.S. 305 (1988); *CP v. Leon County School Board*, 483 F.3d 1151, 1157 (11th Cir. 2007).

Because the term "educational placement" is not statutorily defined, identification of a change in this placement is viewed as "somewhat of an inexact science." *John M. v Board of Education of Evanston Tp High School District 202*, 502 F.3d 708 (7th Cir. 2007) ("*John M*"). It is a particularly difficult exercise where a student progresses from one level of education to another – *e.g.*, from elementary to middle school, or middle to high school – and the "status quo" has no meaningful frame of reference. Addressing this unique sequence in *John M.*, the Seventh Circuit held, under these circumstances, that the obligation of the school district is to provide educational services that simply "approximate the student's old IEP as closely as possible." *Id.* at 715, citing *Ms. S ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115 (9th Cir. 2003) and *Johnson ex rel. Johnson v Special Education Hearing Office*, 287 F. 3d 1176 (9th Cir. 2002):

> [The] cases recognize the need for some degree of flexibility in interpreting the last agreed-upon IEP in a stay-put situation. In complying with the stay put provision, we must interpret "educational placement" to incorporate enough flexibility to "encompass [the child's] experience." ... A child's interim educational regime must produce as closely as possible the overall educational experience enjoyed by the child under the previous IEP. To achieve that result, we must recognize that educational methodologies, appropriate and even necessary in one educational environment, are not always efficient in another time and place in serving a child's continuing educational needs and goals.

*Id.* at 715.

Although not couched in terms of the "materiality failure" analysis employed in *Bobby R.*,[4]

---

[4]In *John M.*, the Seventh Circuit examined the school district's stay-put obligations in a slightly different procedural posture than the instant case. There, the student filed a motion for a preliminary injunction before the district court seeking to maintain the status quo, *i.e.*, his

the *John M.* flexible "approximation" standard is but a logical extension of the truism that the materiality of a controverted (withheld) IEP term in a failure to implement claim is necessarily measured by reference to the underling goals of the original IEP itself. Where a child is transferred, with parental consent, to a profoundly different educational setting, the feasability and utility of following the originally prescribed methodology for achieving the IEP goals is necessarily called into question.

Here, if there is evidence that school officials deviated from any term of the stay-put IEP, the materiality of the deviation is necessarily measured by reference to the feasability and utility of its continued implementation in the new setting in the first instance, in light of the goals of the original IEP. *See e.g. Van Duyn ex rel. Van Duyn v. Baker School District, 5J*, 502 F.3d 811 (9th Cir. 2007) (finding no material failure to implement behavior management plan component of IEP following progression from elementary to middle school, where IEP did not clearly describe how the prescribed methodologies (daily behavior card, social stories and quiet room) were used at elementary school; the IEP did not require that they be used in the same way at middle school; middle school employed many of techniques outlined in behavior management plan, even if not as originally envisioned, and evidence suggested that much of plan was inappropriate in middle school context).

### D. District Court Review

The IDEA authorizes an "aggrieved" party to bring an action in federal court challenging the findings and decision of the ALJ, with the burden of proof falling on the party challenging the

---

original middle school IEP, while litigation over the school district's proposed high school IEP, and a related finding of the hearing officer, was under consideration by the district court. Thus, the issue was there framed preemptively, during pendency of the district court review.

agency decision. 20 U.S.C. § 1415(i)(2)(A); *Barnett v Fairfax County School Board*, 927 F.2d 146, 152 (4th Cir. 1991). The district court's decision must be based on a preponderance of the evidence, giving "due weight" to the results of the administrative findings. *Loren F. Ex rel. Fisher v. Atlanta Independent School System*, 349 F.3d 1309 (11th Cir. 2003); *M.M. School Bd. of Miami-Dade County*, 437 F.3d 1085 (11th Cir. 2006)(per curiam), citing *Rowley* 458 U.S. at 206, 208. While the court is required to consider all administrative findings of fact, it has discretion to determine the extent of the deference it will give to the administrative findings, *Weiss by Weiss v. School Bd. of Hillsborough County,* 141 F.3d 990 (11th Cir. 1998), citing *Doe v. Ala. State Dept of Education*, 915 F.2d 651, 657 n. 3 (11th Cir. 1990), and is free to accept those findings of the ALJ which are supported by the evidence and to reject those which are not *Id.*[5]

While the IDEA allows the district court to hear additional evidence at the request of a party, it is not required to do so. 20 U.S.C. § 1415(i)(2)(C)(ii). It may enter judgment on the basis of the administrative record in proceedings resembling the summary judgment process. *G.J. v. Muscogee County School District,* 668 F.3d 1258 (11th Cir. 2012), citing *Loren v ex rel. Fisher v Atlanta Indep. School System,* 349 F.3d 1309 (11th Cir. 2003). Whether and what types of additional evidence might be considered is a decision left to the discretion of the trial court, which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*. *Id.,* citing *School Bd of Collier County v. K.C.*, 285 F.3d 977, 981 (11th Cir. 2002).

---

[5] *Compare Lessard v. Wilton-Lyndeborough Cooperative School District*, 518 F.3d 18, 24 (1st Cir. 2008 )(district court's review of hearing officer's findings in IEP challenge "falls somewhere between the highly deferential clear-error standard and the non-deferential *de novo* standard.")

### III.  Factual and Procedural Background[6]

Plaintiff N.N.J. is the parent of L.J., a disabled teenager born in May, 1993 who has been diagnosed with Autism Spectrum Disorder and a speech/language impairment. L.J. has been identified as a student eligible to receive special education and related services under the IDEA, and received such services as a kindergarten, elementary and middle school student in the Broward County public school system up through February, 2008.  In 2002, educational professionals at L.J.'s elementary school, along with L.J.'s mother, created an IEP designed to provide specialized instruction for L.J., then a full time third-grade student in a general education setting.

In August, 2005, the School Board developed a new IEP which placed L.J. in a large public middle school.  L.J. immediately displayed a strong aversion to attending the new school.  By the end of August, his increasingly disruptive behavior resulted in three school suspensions.  Police reports followed as his behavior continued to escalate, and N.N.J. ultimately decided to keep him at home and self-teach him with the assistance of tutors for the remainder of that academic year. Thus, essentially L.J. did not attend school for the 2005-06 school year.

At the same time, N.N.J. filed a request for a due process hearing with the State of Florida Department of Administrative Hearings ("DOAH"), challenging the content of the School Board's 2005 IEP.  That complaint was ultimately combined with five other due process complaints which N.N.J. filed in this same time period, all of which were ultimately consolidated and heard before an administrative law judge at a due process hearing which spanned the course of twenty-six days,

---

[6]The recited history is drawn from the administrative record and the parties' briefs and is undisputed unless otherwise noted.

running between October 17, 2005 through June 9, 2006 ["DPH 1"].  On July 21, 2006, the administrative law judge in DPH 1 issued its 191-page final order, concluding that the 2005 IEP provided L.J. with a free appropriate public education; that an independent educational evaluation for assistive technology and reading was not required, and that the School Board adequately implemented the 2002 stay-put IEP during the pendency of review proceedings.   On August 21, 2006, N.N.J. filed an appeal from that ruling in federal district court pursuant to the review procedures established by the IDEA [Case No. 06-61282-CIV-MOORE].  She also returned L.J. to school to begin the 2006-2007 academic year.  From the outset, L.J. again displayed a strong aversion to school attendance, frequently locking himself in the car at the designated drop-off point and refusing to get out of the vehicle despite entreaties of the staff.

On September 5, 2006, N.N.J. met with school administrators to discuss L.J.'s school aversion issues.  This meeting resulted in promulgation of a written plan, developed with the assistance of the Center for Autism and Related Diseases, which the School immediately implemented.  On October 5, 2006, the School held another meeting on the issue, which N.N.J. did not attend.  Despite these efforts, the child's aversive behavior persisted, and was soon compounded by a tremendous number of sick days: 144 absences were reported between October 2006 and March 2007.

On December 20, 2006, N.N.J. filed a *pro se* request for a due process hearing, charging the School Board with failure to fully implement L.J.'s "stay-put" 2002 IEP during the pendency of the review proceedings in DPH1, and unlawful retaliation under Section 504 of the Rehabilitation Act. On February 7, 2007, N.N.J. filed another due process complaint, adding charges regarding the

School Board's alleged failure to adhere to the 2002 IEP requirements governing sun screen applications and other issues. The ALJ consolidated the complaints, and, after numerous amendments, scheduled the due process hearing to commence in May, 2009 ["DPH 2"].

As the new due process complaints unfolded, in March, 2007, L.J. returned to school and was soon embroiled in a number of behavioral upsets, including chair throwing, table turning and computer throwing incidents. After returning to school for the 2007/08 school year, the behavioral problems escalated. In a cafeteria episode which occurred in early November, 2007, L.J. threw kitchen equipment on the floor and attempted to bite and pull the hair of cafeteria staff. Two weeks later, he reacted to an instruction from a reading teacher by turning over tables, and then kicking and pulling the hair of intervening staff. The November incidents led to the filing of police reports, suspension and recommendation for expulsion for battery on a school employee. However, at a subsequent manifestation hearing, school administrators ultimately determined that L.J.'s conduct was the manifestation of his disability and therefore not an expellable act.

On December 6, 2007, N.N.J. met with school officials to jointly discuss development of a new IEP designed to meet L.J.'s changing behavioral and academic needs. This discussion included a reevaluation of L.J.'s current placement in conjunction with two alternative school venues. Ultimately, school administrators determined that another school offered a more appropriate placement to meet L.J.'s needs. N.N.J. objected, concerned that the other school did not have any non-special needs students to present as role models, and that it operated on a school wide behavioral level system (*i.e.*, the behavior plan was the same for all students regardless of disability). N.N.J. was apparently also concerned that students at the other school were exposed to drugs and harsher

experiences.

Despite these misgivings, N.N.J. did initially enroll L.J. at the other school, but, meeting renewed resistance from L.J., ultimately decided not to go forward with that placement. Instead, on February 18, 2008, N.N.J. voluntarily placed L.J. in a residential facility outside of the school, with the School Board agreeing to pay the educational, but not the residential, portion of the cost.

Shortly after, on March 5, 2008, Judge Moore entered his order in N.N.J.'s appeal in DPH1, affirming the ALJ's ruling on the adequacy of the proposed August 2005 IEP and granting the School Board's motion for judgment on the administrative record. Judge Moore also granted N.N.J.'s request for judgment on the record in part, allowing an award of compensatory damages to cover the costs of behavioral services required for the period of September 19, 2005 through December 12, 2006. While explicitly stating the intent of his order was to allow immediate implementation of the August 2005 IEP, Judge Moore did encourage the parties to meet and develop a new or updated IEP in light of its advanced age by that juncture [Case no. 06-61282, DE # 84].

N.N.J. filed an appeal from the order affirming the adequacy of the 2005 IEP and the School Board filed a cross-appeal. On July 10, 2008, the Eleventh Circuit entered an order dismissing both appeals for lack of jurisdiction, finding that the March 5, 2008 order was not final and appealable because it "did not resolve the issue of the amount of monies to be included in the compensatory award," and did not include a proper certification for immediate review under Fed. R. Civ. P. 54(b).

Finally, in March 2009, Administrative Law Judge Errol H. Powell commenced hearing in DPH2. After eighteen days of trial testimony spanning the course of six months, the hearing concluded on October 20, 2009. Fifteen months later, on January 1, 2011, the ALJ issued a 101-

page final order concluding that the School Board violated the "stay-put" provisions of the IDEA by not adequately implementing L.J.'s 2002 stay-put IEP during the pendency of federal judicial review proceedings in DPH1-- which spanned the course of L.J.'s 2006/07 and 2007/08 school years -- and thus failed to provide L.J. with a free and appropriate public education during that time period. The ALJ determined that L.J. was entitled to the remedy of a compensatory education for this lapse,[7] including payment needed to obtain the IDEA services that L.J. should have received but did not receive, up through the maximum age of IDEA entitlement (22 years). The ALJ, however, made no findings on the amount of compensatory damages required to address the deficiency.

In addition, the ALJ found that the School Board discriminated and retaliated against N.N.J. and L.J. as a result of their exercise or attempted exercise of rights under the IDEA, entitling them to non-economic compensatory damages under Section 504 of the Rehabilitation Act. However, the ALJ found that he lacked authority to fashion such a corresponding damage award.[8]

In ruling on N.N.J.'s failure-to-implement claim, the ALJ adopted the "material failure" standard articulated in *Houston Ind. Sch. Dist. v. Bobby R.,* 200 F.3d 341 (5th Cir. 2000), discussed *supra.* After comparing the terms of the 2002 "stay-put" IEP to the services provided by the School

---

[7] A "compensatory education" is an equitable remedy that "aim[s] to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D. C. Cir. 2005); 20 U. S. C. § 1415(i)(2)(C)(iii). *See e.g. Ortega v Bibb County School Dist* 397 F.3d 1321 (11th Cir. 2005) (district court's discretion to award monetary damages under IDEA extends only to restitution for money that should have been paid by the state for educational services, not general damages).

[8] At the hearing on the present motions, L.J.'s counsel acknowledged that the ALJ's finding of retaliation is not binding and that the question of retaliation will be decided in these proceedings.

Board during L.J.'s 2006/07 and 2007/08 school years, the ALJ concluded that N.N.J. successfully demonstrated more than minor discrepancies in the school's implementation of L.J.'s stay put 2002 IEP, giving rise to a violation of the IDEA. The specific services found to be lacking included "reading; math referral; occupational therapy; speech and language; collaboration weekly (weekly meetings) by the IEP team and by the SLT meeting separately; general education inclusion; lesson plans and other study materials; worksheet adjustments/modifications to the child's work; progress reports; AlphaSmart; assistive technology; FM system; Buddy System/Social skill training; FCAT accommodations, and the child's sensitivity to the sun."

### IV. Issues on Appeal

In its current appeal, the School Board contends that the ALJ made numerous erroneous factual findings that are either unsupported or contradicted by the evidence in the administrative record. In addition, it contends that the ALJ reached an erroneous conclusion regarding the sufficiency of the School Board's implementation of the 2002 stay-put IEP under the IDEA by applying an incorrect legal standard of review.

More specifically, it complains that the ALJ applied a standard of review which improperly focused on what the School Board failed to do, employing the "material failure" test articulated by the Fifth Circuit in *Bobby R.*. Instead, the School Board asserts the ALJ should have applied the "basic floor of opportunity" test articulated by the Supreme Court in *Rowley,* which looks simply to whether the child received "some educational benefit" under the IEP developed by the school district.

However, the cases on which the School Board relies are not failure to implement cases –

they are content-based challenges to a school system's development of the IEP which correctly apply the *Rowley* "basic floor of opportunity" yardstick for measuring the adequacy of a FAPE. *See Devine v Indian River County School Board*, 249 F.3d 1289 (11th Cir. 2001); *JSK v Hendry County School Board*, 941 F.2d 1563 (11th Cir. 1991).

Conversely, N.N.J contends that the ALJ correctly applied the "material failure" standard articulated in *Bobby R*. However, she does not identify any cases which apply this standard in a "stay put" implementation-failure context crossing two institutional settings and multiple academic years. As discussed above, however, the "materiality" of an IEP implementation failure in this unique context is appropriately gauged by reference to changes in the educational setting inherent in the transfer, while accounting for fluidity of educational methodologies over time and place under the flexible "stay put" implementation test outlined by the Seventh Circuit in *John M*.

The ALJ did not apply this standard in reaching his conclusions, and neither party has based its briefing before this Court on this standard.

## V. Supplemental Briefing Schedule

Accordingly, the Court directs the School Board to file a supplemental brief in support of its motion for judgment on the administrative record that analyzes the evidence adduced before the ALJ under the flexible "materiality" standard articulated above, as derived from the Seventh Circuit's *John M*. analysis. In its supplemental brief, the School Board is directed to address the adequacy of the evidence under this standard as it relates to each IEP deviation or implementation failure outlined in the ALJ order under review, *itemizing each alleged deviation under a separate heading and directing the court to specific testimony in the record* by reference to transcript volume and page

number, *as well as specific citation to its location in the court file* (e.g. DE# 27-1, Transcript of Proceedings, Volume I, p. 12.).[9] In its discussion of the evidence, the School Board shall further *identify the specific language of the IEP from which each alleged educational service deficiency is derived,* and if it contends that the IEP does not expressly or impliedly require a particular educational service, it shall expressly so state.

In addition, the School Board shall direct the Court *to specific evidence in the record* relating to the parent's alleged contribution to L.J's excessive absenteeism, as well as *specific evidence which touches upon efforts taken by School Board* to address and remediate the absenteeism problem. *Again, the references to the record must be by specific citation to the location of the testimony in this court's file, including specific docket entry numbers, as well as volume and page references.*

After submission of School Board's Supplemental Brief, N.N.J. shall file a response brief within fifteen days of service to include an analysis of the evidence under application of the standard articulated in this order, along with specific citations to the record as required above. The Court will decide the remaining portion of School Board's motion for judgment on administrative record after reviewing the supplemental briefs. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the Court defers ruling on the following motions:

1) The School Board's Motion for Judgment on the Record [DE 29];

---

[9] If either party wishes to rely on documentary exhibits introduced in the administrative proceedings in rendering its supplemental analysis, it must supplement the record by filing the relevant exhibits with the court. If it seeks to file any exhibits under seal, it shall follow the procedures prescribed at Section 5A, Administrative Procedures, Case Management Electronic Case Filing CM/ECF, Southern District of Florida (eff. Dec. 1, 2011) [Note: It is not necessary to file all 500-plus introduced in the administrative proceedings below - only those which are relevant to arguments and points raised on appeal].

2) Plaintiffs' Motion for Judgment Affirming the Administrative Law Judge's Order [DE 30];

3) Plaintiffs' Motion for Taking Additional Evidence on Amount of Compensatory Education Award and for an Evidentiary Hearing [DE 36].

For statistically purposes only, these motions are terminated.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 29th day of March, 2012.

KENNETH A. MARRA
United States District Judge